Gregory M. Garrison, Esq. SBN 165215
Brook T. Barnes, Esq. SBN 276667
TEEPLE HALL, LLP
9255 Towne Centre Drive, Suite 500
San Diego, CA 92121
Telephone:	(858) 622-7878
Facsimile:	(858) 622-0411
E-Mails:	greg@teeplehall.com
	brook@teeplehall.com

Attorneys for Plaintiffs MARK BUCHANAN and BRIAN SHAW

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK BUCHANAN and BRIAN SHAW,<br><br>             Plaintiffs,<br><br>     vs.<br><br>HOMESERVICES LENDING, LLC, Doing Business As HOMESERVICES; and DOHERTY EMPLOYMENT GROUP, INC.,<br><br>             Defendants. | Case No. 11-CV-00922-L-MDD<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>[Action Filed: April 29, 2011]<br><br>Hearing: December 3, 2012<br>Time: 10:30 a.m.<br>Courtroom: 14<br><br>Assigned to: M. James Lorenz<br>Mag. Judge: Hon. Mitchell D. Dembin |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## I. DEFENDANTS' OPPOSITION MISLEADS THE COURT

Plaintiffs MARK BUCHANAN and BRIAW SHAW (hereinafter "Plaintiffs" or "Buchanan" and "Shaw") respectfully submit the following Reply in Support of their motion for class certification. Without waiving previous arguments, Plaintiffs' reply addresses Defendants' four logical fallacies fatal to their opposition: 1) If Defendants did not formally write an illegal provision as a company reimbursement policy in their handbook, then the incurred expenses were optional; 2) If Defendants did not formally write an illegal provision as a company reimbursement policy in their handbook, then all putative class members volunteered their money for Defendants' financial success; 3) If any class member received some value for the disputed marketing fees, then Defendants do not have to reimburse class members; and 4) If Plaintiffs Buchanan and Shaw bring individualized overtime claims with their class claims, they are inadequate class representatives. Such vapid logic misses the mark, again.

## II. PLAINTIFFS' CLAIMS SATISFY FRCP 23(B)(3)

### A. Plaintiffs' 2802 Claim Does Not Require Individualized Proof that the Expenses were Necessary

The evidence before this Court is not a company handbook that mandates required fees for all employees—Defendants are not so obtuse. Instead, Defendants promulgated strong arm tactics through their management, who strived for 100% compliance and maximum profitability at the expense of violating California Law.

#### 1. *Defendants Determined the Necessary Nature of the Website Fees*

In 2009, Todd Johnson, the President of HSL, emailed Mike Reza, the Manager of California Operations, the following about websites and Fast Mail:

> The process for web sites and Fast Mail is actually pretty easy, isn't it? ***We need to have a post hire checklist for every HMC that checks all of these things off as completed and validated.***[1] (emphasis added).

In deposition, HSL's Manager of California Operations, Michael Reza, stated about the websites ". . . at a minimum they were requested. They were encouraged, requested, and maybe

---

[1] See Exhibit 9 to Plaintiffs' Lodgment of Documents in Support of Opposition ("LDO")

1

in some cases required, though I don't know how strong that definition is.[2]" However, discovery indicates that HSL deducted this website fee across all three regions in California: San Diego, Orange County, and the L.A. regions.[3], Defendants common policy of deducting website fees from sub-class members' wages is evidenced by Defendants' own records, their President of California's testimony, and discovered emails:

> "We ***have to commit in having 100% of our HMCs owning an HSL website through HSL marketing. Therefore, I would like to ask everyone that does NOT have a website to invest in one ASAP*** (Most of you already have one). This is a "one for all, all for one" issue!! The cost is $40/month and it's taken out your gross pay every month. I believe 70% of you already have one---THANKS for making the investment. This is a small investment for the kind of push we're going to see from Prudential…***WHAT YOU MUST DO***: Delegate Michael Yip and myself... And for those that do not have a website set up, follow the instructions below:"(emphasis added)[4]

Defendants would have this Court believe that Defendants' outright ignorance is required for Plaintiffs' claims to be certified. In truth, Defendants' emails detail the mandatory nature of the website fees. As noted in Plaintiffs' supplemental declaration to the Court, Plaintiffs only recently discovered Michael Reza's emails. Defendants' policy as promulgated from the top down via Todd Johnson, Michael Reza, Danny Valentini and Michael Yip is documented through email evidence—evidence that will only increase with certification and additional discovery.

    2. *Defendants Determined the Necessary Nature of the E-Business Card Fees*

The evidence before this Court clearly shows that Todd Johnson told his Branch managers and Michael Reza to utilize the marketing programs such as e-business cards:

> Give some thought to ***making sure that 100% of your HMCs are using the tools that we have in agent messaging***, and on a regular basis. This email, as well as Karen Duff's from last week in the Sales System update for Sharing Advantage and VA loans (Veteran's Day - Nov 11) move HSL to a higher position in the agent's business relationship with us.
>
> ***Also, I think it would be outstanding if the electronic business card program below were used by HSL - CA***. Trust me when I tell you that the top producers

---

[2] CFE No. 9
3 CFE No. 10
[4] CFE No. 15

2

Buchanan v. HomeServices Lending LLC et al.  .  Case No. 11-CV-0922-L-(MDD)
Plaintiffs' Opposition to Defendants' Motion to Deny Class Certification

Teeple Hall, LLP

in other markets in market share wouldn't imagine not having this, and it's only $50 up front and $30 bucks a year.[5] (emphasis added).

In fact, Michael Reza's 2010 Business plan for HSL included an initiative to drive capture rates by "fully utilize[ing] the HSL Marketing Department[ . . including] "E-Business Cards."[6] From these communications and business plans from Todd Johnson down to Branch managers, HSL enforced a marketing policy that required class members to incur HSL's business expenses. In fact, all the expenses at issue in this case were seen as HMC responsibilities, as evidence by Defendants' 2009 Business Review and Sales Plan which views "Marketing and Promotional Awards—investing back into the HMC's business," as a method for "retention-sales team focus."[7] When managers were not compliant with methods of profitability, they were disciplined.[8] When marketing expenses became too high, containment practices were put into place.[9] Essentially, the business model for HSL required HMCs to shoulder the necessary business expenses incurred while performing their job so that HSL could increase their profit margin: "Objective: Grow Profitability and Increase Market Share."[10] This mantra was communicated from the top down during manager meetings with HMCs and HMC Jrs., as well as meetings with Prudential Realty.[11]

Often, Danny Valentini instructed HMCs to complete credit card information:

"Please review the Marketing Initiative plan that we are going to implement: 1. Electronic Business Card Signature (***Must*** be set up by 12/01/2009): $50.00 initial setup fee (includes the first year of service) will be covered by the branch. The cost for subsequent years is $30.00 per year. Please see the instructions below;"(emphasis added).[12]

However, the initial setup fee for the e-business card was actually charged to the HMC and HMC Jr.'s credit cards for at least the San Diego Region.[13] In fact, Mr. Yip sent a follow-

---

[5] Exhibit 2 to LDO
[6] Exhibit 3 to LDO7
[7] Exhibit 4 to LDO
[8] Exhibit 5 to LDO
[9] Exhibit 7 to LDO
[10] Exhibit 4 to LDO
[11] Exhibit 10 to LDO
[12] CFE No. 21
[13] CFE No. 22

3

up email stating: "eBusiness Cards - Almost done. I'm setting up the account and using everyone's credit card for this one."[14] HSL's Manager of California Operations, Michael Reza, stated that he believed that Plaintiffs' manager, Danny Valentini, "at least encouraged [the use of e-business cards]. He may have required [their use]."[15] Michael Reza continued to testify that he believed Michael Moses, who was the Branch Manager over the Orange County Region, and Jeff Uniack, who was the Branch Manager over the Los Angeles Region, also at least encouraged and possibly required the use of the e-business cards.[16] The evidence before this Court demonstrates that Defendants implemented this common policy of requiring sub-class members to pay for the e-business cards across all three of its California regions.

### 3. *Defendants Determined the Necessary Nature of the Marketing Mailer Fees*

The evidence before this Court shows that management, such as Michael Reza, pressed his Branch Managers to participate in these mailer campaigns per Todd Johnson's instruction: "Just wanted you to know that we have been working to get the HMCs to utilize our Marketing Material including 'On the Inside.'"[17]

Michael Reza testified that there were several mailer programs at HSL, some of them were internal and some of them used a third-party marketing firm.[18] Mr. Reza testified that how HSL recouped costs from the employees varied for each program:

> We had different programs. Some were taken from their paycheck and some needed a credit card on file [. . .] And they varied from time to time. So something may have initially started off with a payroll deduction and, then, later had to be transferred to a credit card.[19]

Often, Danny Valentini instructed HMCs to complete credit card information:

> "***Please review the Marketing Initiative plan that we are going to implement***: [. . .] 3. In Touch Today: More information and examples to follow next week. This is an "Auto Pilot" postcard plan, similar to the "5yr in touch" I implemented (sic) at first Cap, where we will send out quarterly mailings to your funded file database. The database will be updated on a quarterly basis and

---

[14] CFE No. 23
[15] CFE No. 24
[16] CFE No. 25
[17] Exhibit 1 to LDO
[18] CFE No. 27
[19] CFE No. 28

4

if you have your own database that you would like to be added to this list, we will be able to accommodate your needs. **The branch will pick up 50% of the cost of these mailers. Pricing Example: (1000 names x .52) - 50% =$260 per quarter on your credit card GREAT DEAL!!!**"[20] (emphasis added).

Similarly, area administrators such as Michael Yip sent emails instructing HMCs and HMC Jrs. to complete the mailer marketing information:

"3 Marketing Pieces ---- In Touch Marketing Postcard Order ---- HMC *must* complete and fax the form in [ . . .] You *must* complete "In Touch Marketing Postcard Order" as it requires your signature. Please fill out the form and fax it in as soon as you can or your marketing mailers will NOT be sent out. If you have not received the email yet, you will receive it shortly."(emphasis added).[21]

When asked if HMCs in the Orange County Region and Los Angeles Region received similar messages from their Branch Managers and Area Administrators, Michael Reza who managed all of California stated:

Jeff [Uniack] would have sent some similar information encouraging people or requiring or requesting that they participate in the marketing pieces. [. . .Mike Moses] would have [as well].[22]

Essentially, Defendants' common policy per Todd Johnson required subclass members to shoulder 50% of the cost of these mailers so that Defendants could market and sell HSL's loan products:

Our company policy in a number of markets that have this type of service reimburse the *HMC 50% of the cost, as we only reimburse 50% for other types of marketing related expenses that are prior approved by AM's*. *Also, submitting 2009 expenses is a real problem for WF and HSL*. Let's catch up on this tomorrow or Monday, okay? (emphasis added).[23]

In fact, Danny Valentini admitted the mandatory nature of the mailers in his region following a mailer incident that resulted in potential borrowers getting mailers from the wrong HMCs:

If this is not an isolated incident, it poses a great threat to the whole program among all the HMCs. They were *"strongly" encouraged to sign up, and contribute monetarily.*[24] (emphasis added, quotations original).

---

[20] CFE No. 28
[21] CFE No. 29
[22] CFE No. 34
[23] Exhibit 8 to LDO
[24] CFE No. 35

5

Further, when Todd Johnson asked Michael Reza and Danny Valentini about reaching out to past clients via fast mail, perfect reach, or another postcard campaign, Valentini responded that he would have his HMCs call the clients (free to the HMC):

> I advised all my HMCs to query their ACT database for possible opportunities yesterday (I sent you the email). ***I spoke to many of them and instructed to have the HMC call the opportunities. I think this is the most effective approach. Fast mail and postcards could delay us.*** I wanted to see quicker results. We are still working with Fast mail on a continuous manner. I will also ask Tracy to look at a postcard mailer today…thanks for the follow up. (emphasis added).[25]

However, this cheaper method was not agreeable to Todd Johnson:

> Danny
> In a rate rally, a phone call campaign is an augmentation to a full marketing plan( by mail), so I disagree with you. ***You need to bring your branch forward with written, documented marketing follow up plans for your entire closed pipeline***. For example - if I am a past customer of an HMC who has left your branch, who have I received a note from and who is my new HMC? I should get at least a letter from you introducing them to their new HMC, and get your card for follow up. ***I should get something in the mail every 3 months from my HMC.*** We can speak later about this. (emphasis added).[26]

Accordingly, Plaintiffs established the common proof needed to satisfy the predominance element through the deposition testimony of Mike Reza, the head of California operations, who testified that all of the managers sent emails similar emails to the putative class regarding the marketing programs.

### B. Plaintiffs' 2802 Claim Does Not Require Individualized Proof that the Expenses Were Voluntary

Defendants' misplaced reliance on *Howard v. Gap, Inc.,* 2009 U.S. Dist. LEXIS 105196 (N.D. Cal. Oct.29 2009) and its progeny underscores Defendants' last ditch effort to equate marketing expenses to clothing. Contrary to Defendants' contention about the individualized inquiry into the voluntary nature of an expense, the *Howard* Court denied certification because it could not find a common way to establish liability. This procedural concern is inherent in clothing reimbursement and is best summarized in *Washington v. Joe's Crab Shack,* 271 F.R.D.

---

[25] Exhibit 6 to LDO
[26] Exhibit 6 to LDO

6

Buchanan v. HomeServices Lending LLC et al.  .  Case No. 11-CV-0922-L-(MDD)
Plaintiffs' Opposition to Defendants' Motion to Deny Class Certification

629, 642 (N.D. Cal. 2010): "***Moreover, plaintiff's proposed method of proof would not answer the most important question—who purchased T-shirts, or why***. The only way to determine who purchased T-shirts, and why they purchased them, is through individualized analyses, and class treatment is therefore not appropriate." (emphasis added). The exact same failure to demonstrate liability is stated in *Morgan v. Wet Seal, Inc.,* A133590, 2012 WL 4841600 (Cal. Ct. App. Oct. 12, 2012):

> [. . .] On order for evidence of sales records to provide a common method of proving liability, ***those records would have to demonstrate why the purchases were made***. *Id.*

Indeed, Defendants do not deny that these marketing expenses were incurred within the scope of employment for the benefit of the employer, and thus the *Howard* Court's concern is unfit for this motion.

### C. Plaintiffs' 2802 Claim Does Not Require Individualized Proof Regarding Value

In the face of California law, Defendants argue that if an employee receives value for a necessary expense, then there has been no harm, and therefore the employer is not required to reimburse the employee. This basic logical fallacy is neither supported by *Zalkind v. Ceradyne, Inc.,* 194 Cal. App. 4th 1010, 1023-24 (2011), nor §2802 and § 2804. Borrowing Defendants' logic, if a salesman submitted receipts for travel expenses where that salesman closed a large deal and received a commission, that employee would not be entitled to reimbursement because he received some value in the form of a commission. However, Plaintiffs are not required to show that putative class members received no value for each marketing program because such a proposition contradicts the basic premise of §2802 and §2804.

### D. Plaintiffs Adequately Represent the Class

Plaintiffs satisfied Rule 23(a)(4) as representation to date "fairly and adequately protect[ed] the interests of the class." Despite Defendants' argument, Plaintiffs' individual overtime claims do not rise to the level of antagonistic or conflicting interests with the unnamed members of the class." *Lerwill v. Inflight Motion Pictures, Inc*., 582 F.2d 507, 512 (9th Cir. 1978). In fact, Plaintiffs' overtime claims do not go to the to the heart of the litigation in a manner that that would preclude Plaintiffs from adequate class representation. In fact,

7

Buchanan v. HomeServices Lending LLC et al. . Case No. 11-CV-0922-L-(MDD)
Plaintiffs' Opposition to Defendants' Motion to Deny Class Certification

1 Plaintiffs' vigorous pursuit of these claims is evidenced by Plaintiffs' counsel requiring the competing *DeBlanco* action to specially reserve Plaintiffs' claims as a class basis as their failure to contemplate these claims would assuredly been waived under general and mutual releases present in that action. *See Rene De Blanco v. Home Services Lending LLC et al* CV 11-08254 SJO (MRWx) (C.D. Cal. Jun 4, 2012).

Defendants cite to *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) for the proposition that "a named plaintiff's motion for class certification should not be granted if there is 'a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Hanon* at 508, *citing Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990), cert. denied, 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991) (Court denied certification where purported representative's class claim was atypical because, unlike the remainder of the class, the plaintiff had knowledge of the fraud underlying the class claim). Defendants misapply the *Hanon* holding by arguing that "unique defenses" to the Plaintiffs' individual claims prevented the *Hanon* Court from certifying the class. However, the court continued: "[h]ere, Hanon's unique background and factual situation require him to prepare to meet defenses that are not typical of the *defenses which may be raised against other members of the proposed class*." *Id* (emphasis added).

However, *Hanon* does not state that Plaintiffs' individual claims may serve as a basis to attack the typicality requirement of their class claims. Instead, it limits itself to whether the Plaintiff's alleged class claim is itself unique from the class claims the remainder of the class. As this Court is aware, when it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually satisfied, irrespective of varying fact patterns which underlie individual claims." *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 683 (S.D. Cal. 1999), citing *Smith v. University of Washington Law School*, 2 F.Supp.2d 1324 (W.D. Wash. 1998). As such, Defendants reliance on *Hanon* is uninformed and inapt to this matter before the Court.

/ / /

/ / /

8

Buchanan v. HomeServices Lending LLC et al.  .  Case No. 11-CV-0922-L-(MDD)
Plaintiffs' Opposition to Defendants' Motion to Deny Class Certification

## III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to certify this case and permit Plaintiffs to proceed as a class action and representative PAGA action on behalf of the aforementioned class members, and to appoint Gregory M. Garrison and Brook T. Barnes Teeple Hall, LLP as class counsel.

Dated: November 26, 2012           TEEPLE HALL, LLP

By: */s/ Gregory M. Garrison*
Gregory M. Garrison, Esq.
Brook T. Barnes, Esq.
Attorneys for Plaintiff
MARK BUCHANAN and BRIAN SHAW

9

Buchanan v. HomeServices Lending LLC et al.         .         Case No. 11-CV-0922-L-(MDD)
Plaintiffs' Opposition to Defendants' Motion to Deny Class Certification